UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
----------------------------------

MICHAEL J. JACKSON,

                Plaintiff,

  -v-                                               6:14-CV-563

THE VILLAGE OF ILION, NEW YORK,
RYAN C. PAVLOT, Individually and as a
police officer of the Ilion Police Department,
and JASON E. MONAHAN, Individually and
as a police officer of the Ilion Police
Department,

                Defendants.

----------------------------------

APPEARANCES:                             OF COUNSEL:

OFFICE OF STEPHEN L. LOCKWOOD      DANIEL N. CAFRUNY, ESQ.
Attorneys for Plaintiff                     STEPHEN L. LOCKWOOD, ESQ.
285 Genesee Street
Utica, NY 13501

MURPHY, BURNS LAW FIRM               THOMAS K. MURPHY, ESQ.
Attorneys for Defendants
226 Great Oaks Boulevard
Albany, NY 12203

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

     This civil action arises out of the detention of plaintiff Michael Jackson ("Jackson" or "plaintiff") during the execution of a search warrant at 514 Church Street in Herkimer, New York in connection with a criminal investigation into Brandon McNair, a suspected cocaine

dealer. Plaintiff, who is unrelated to McNair or his family, became mixed up in this affair because he rents a room in the McNair's three-story Church Street home.

Jackson asserts claims pursuant to 42 U.S.C. § 1983 and state law alleging excessive force, failure to intervene, assault, battery, and negligence against the Village of Ilion (the "Village") as well as Ryan Pavlot ("Pavlot") and Jason Monahan ("Monahan"), the two Village police officers identified as being directly involved in detaining plaintiff during law enforcement's execution of the search warrant.

Following the completion of discovery, the Village, Pavlot, and Monahan (collectively "defendants") moved pursuant to Federal Rule of Civil Procedure ("Rule") 56 for summary judgment on all of Jackson's claims. Plaintiff opposed. The motion was fully briefed and oral argument was heard on December 18, 2015 in Utica, New York. Decision was reserved.

## II. BACKGROUND[1]

On October 4, 2013, Herkimer County Court Judge John H. Crandall issued a warrant authorizing a search of the "entire residence" at 514 Church Street. Defs.' Ex. A. Specifically, this "no-knock" warrant permitted law enforcement officials to search the home, as well as "any persons located therein," for cocaine and "any evidence that tends to demonstrate that a drug related offense was committed." Id.

---

[1] The background on summary judgment is ordinarily drawn from a careful review of a movant's Statement of Material Facts and a non-movant's response to same, since a comparison of these documents typically serves to chronicle the relevant events as well as highlight pertinent factual disputes in the parties' competing narratives. However, Jackson's responsive submission is not particularly helpful in achieving this goal, for reasons that will be discussed below. Nor has plaintiff submitted his own affidavit in opposition, which might have distilled his earlier descriptions of events into a clear narrative for purposes of this motion.
    Therefore, the background recounted here has been culled from an independent review of all the submissions in this case, the primary one being a transcript of plaintiff's 50-h examination, which was submitted in its entirety as part of plaintiff's opposition paperwork. See Jackson 50-h examination ("Jackson Exam"). Finally, although defendants' respective versions of events almost completely align with plaintiff's narrative, the few relevant additional details and minor factual disputes have been carefully noted.

At the time, police possessed information that indicated "four to five" individuals were regularly living at the house, and that Brandon McNair—the primary target of the investigation—was "known to have a hand gun and deal[ ] drugs from inside of the residence." Defs.' Ex. B. A joint task force from the Ilion and Herkimer police departments planned to execute this search warrant early in the morning of October 11, 2013. Id. As Officer Pavlot explained, their task that morning was "to look for guns and drugs and control the scene until we could make sure that the scene was safe." Pavlot Dep. at 5 and 9.

On the morning in question, Jackson awoke from his third-floor bedroom around 6:30 a.m. and descended to the second-floor kitchen, which he shared with several members of the McNair's extended family, to make coffee and start his day. Jackson Exam at 35. Plaintiff suffers from cerebral palsy, a type of permanent movement disorder that affects his lower limbs and makes it more difficult for him to walk. Id. at 14.

According to Jackson, he was still in the second-floor kitchen around 7:00 a.m. when he heard people running up the stairs, shouting "Police warrant, open up. Freeze." Jackson Exam at 37. Several officers entered the kitchen and plaintiff complied when they initially told him to get down on the ground.[2] Id. at 38.

After officers performed a quick search of the third-floor attic area, "three or four" officers came back to where Jackson was located on the floor of the second-floor kitchen and instructed him to put his hands behind his back. Jackson Exam at 38-39. Plaintiff responded "I can't" and asserts that he "told them [he] had a disability." Id. When the officers

---

[2] Several of the McNair relatives who were also living on the second and third floors are present for these events, but none become involved with Jackson's story and therefore references to them have been omitted for narrative clarity.

nevertheless insisted that he comply, plaintiff "asked if [he] could put [his hands] in the front of [himself]." Id. at 40. The officers refused plaintiff's request. Id.

Jackson states that the officers then began to handcuff him, managing to get plaintiff's right arm behind his back before they "grabbed [his left] arm and tried to put it behind [his] back." Jackson Exam at 40. Plaintiff claims "[t]hey were really clenching up on [his hands] pretty hard" at this time. Id. After a few moments, the officers managed to put handcuffs on plaintiff.[3] Id. at 41. Plaintiff asserts that the officers "wrench[ed]" his left arm behind his back during this handcuffing. Id. at 101.

According to Jackson, the officers then instructed him to stand up. Jackson Exam at 42. When he again responded "I can't," plaintiff states that the officers "helped [him] up"—as plaintiff explained, he rolled onto his side, then managed to get his knees underneath him before both officers "helped [him] up the rest of the way." Id. Plaintiff states that the officers accomplished this last bit by standing at his sides and holding onto his arms as he achieved this standing position.[4] Id. at 47. These two officers would later be identified as Pavlot and Monahan.

Jackson asserts he had just managed to stand up when "[o]ne of [the defendants] kind of pushed into [him] and [he] fell forward." Jackson Exam at 48. When pressed about this, plaintiff explained that "one of them"—either Pavlot or Monahan, but he was unsure of which—had let go of one of his arms, and at around that same time, the other officer "pushed into [him] with like his shoulder or body" and caused him to "hit [his] head on the microwave,"

---

[3] Officer Pavlot claims that Jackson initially resisted the attempt to place his hands behind his back, but eventually complied. Pavlot Dep. at 12-13.

[4] Officer Monahan claims he arrived in the kitchen in time to help Jackson to his feet. Monahan Dep. at 10-11.

- 4 -

which was located on a nearby countertop. Id. at 49.[5] When further questioned about what he meant by the word "push," plaintiff explained that he meant "it was sort of on purpose but wasn't [the officer's] intention," but seemed to have occurred because the officers were "being so forceful." Id. at 96.

Pavlot and Monahan do not deny that any of these events occurred, but add one salient detail—while they were helping him to his feet, plaintiff informed them that his pants were falling down. Pavlot Dep. at 19. Defendants assert they were reaching down to pull plaintiff's pants up at the time plaintiff fell forward and struck his head on the microwave.[6] Id. at 20. According to Officer Monahan, "the cuffs on the bottom of [plaintiff's] pants were underneath onto his socks," making it a possible danger for walking downstairs.[7] Monahan Dep. at 12.

The officers then patted Jackson down and escorted him to the second-floor stairwell, where they asked him to walk downstairs. Jackson Exam at 50. Plaintiff again replied that he couldn't, because he needed to use the railing for help descending the stairs. Id. at 61. Plaintiff further explains:

> Actually, I kind of argued with them for a little bit. I said, "I can't go down the stairs," and they insisted and I was like, "I can't go down the stairs."

Id. At this point, the parties' respective versions of events briefly diverge.

---

[5] Plaintiff claims one of the officers exclaimed "Oh, shit" when this happened. Jackson Exam at 50.

[6] Officer Pavlot clarified that he felt, more than saw, this happen, because he was looking down at plaintiff's pants at the time. Pavlot Dep. at 20-21.

[7] Jackson acknowledges wearing "jeans and a t-shirt" that morning. Jackson Exam at 35.

- 5 -

For his part, Jackson claims the officers chose to summarily end the dispute over whether plaintiff was going to walk down the stairs: "[a]nd then they just basically picked me up by my arms and my legs." Jackson Exam at 61. According to plaintiff, the officers carried him down a total of about six steps to a landing on the stairwell before realizing plaintiff was "pretty upset" and deciding to take off the handcuffs to allow him to navigate the rest of the stairs on his own. Id. Plaintiff asserts he was in handcuffs for a total of "[a]bout three to four minutes, maybe a little bit longer." Id. at 102.

For their part, Pavlot and Monahan deny carrying Jackson down any stairs at all. Pavlot Dep. at 21; Monahan Dep. at 21. Rather, they claim that Herkimer Police Sergeant Long, one of their superiors at the time, "came up the stairs and advised" them that they "could handcuff plaintiff with his hands in front." Pavlot Aff. at ¶ 18. According to Pavlot, plaintiff was then able to walk down the stairs himself. Id. ¶ 19.

This issue aside, the parties agree that Jackson was then instructed to enter the living room on the first floor, where the other occupants of the house had been gathered. Jackson Exam at 62. Plaintiff, now free of the handcuffs, claims he was still "pretty upset" at this time, so the officers "let [him] go back upstairs so [he] would calm down." Id. at 64. Plaintiff went upstairs, poured himself a cup of coffee, and went back downstairs to the living room. Id. The officers then "pretty much took what [evidence] they had" and left. Id. at 65.

After the police left, Jackson went to the emergency room, where his head, arms, and wrists were examined for injuries. Jackson Exam at 67. Plaintiff was prescribed an anti-inflammatory, which he took for a "couple days" before flushing the rest down the toilet. Id. at 68-69. Plaintiff received x-rays on a follow-up visit and was told that "everything looked okay." Id. at 70. Plaintiff has since followed up with a specialist for injuries to his right

shoulder. Id. at 71. As a result of these events, plaintiff claims that he continues to experience pain that significantly limits his range of motion and ability to perform daily activities.

## III. **LEGAL STANDARD**

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

When summary judgment is sought, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim. Id. at 250 n.4. The failure to meet this burden warrants denial of the motion. Id. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Id. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553. Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); see also

Anderson, 477 U.S. at 250 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

## IV. **DISCUSSION**

### A. **Officers' Entry and Jackson's Detention**

As an initial matter, Jackson's opposition paperwork, and in particular his Response to defendants' Statement of Material Facts, attempts to: (1) characterize plaintiff's rental arrangement with the McNair family as creating an entirely "separate residence" within the Church Street home, suggesting any police intrusion into this particular area of the dwelling was impermissible; and (2) establish that police had no evidence implicating him in the criminal activity being investigated in the warrant and therefore lacked authority to detain him for any length of time at all.

But both of these assertions run afoul of binding U.S. Supreme Court precedent. "Police executing a search warrant are privileged to detain individuals, even to the point of handcuffing them, while [a] search is carried out." Bancroft v. City of Mt. Vernon, 672 F. Supp. 2d 391, 403 (S.D.N.Y. 2009); see also Michigan v. Summers, 452 U.S. 692, 705 (1981) ("[A] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.").

As the Supreme Court has since explained, "Summers makes clear that when a neutral magistrate has determined police have probable cause to believe contraband exists,

'[t]he connection of an occupant to [a] home' alone 'justifies detention of that occupant.'" Muehler v. Mena, 544 U.S. 93, 99 n.2 (quoting Summers, 542 U.S. at 703-04).[8]

In this case, the warrant issued by Judge Crandall authorized a search of the "entire residence" at 514 Church Street, as well as "any persons located therein," for drugs and related evidence. This broad language, which concerned an entire structure and all of its occupants as opposed to an individual room, apartment, or list or suspects, is clearly sufficient to authorize law enforcement's intrusion into all areas of the home as well as the temporary detention of everyone found inside at the time.

Further, even assuming the search warrant simply identified the "entire residence" at Church Street and omitted any specific language regarding the dwelling's occupants, the officers' entry—privileged as it was on the basis of the search warrant for drugs, the validity of which Jackson does not challenge—would also entitle them to temporarily detain anyone found inside the premises, for safety purposes, while conducting the search. See, e.g., Jackson ex rel. Jackson v. Suffolk Cnty., 87 F. Supp. 3d 386, 401 (E.D.N.Y. 2015) ("First, even though [the defendant officer] believed that [plaintiff's mother] was not a suspect, it was not unreasonable, in the interest of safety, for the officers to detain and handcuff [the minor plaintiff] during the search.").

Given the undisputed circumstances presented here, Jackson cannot seriously claim the officers did not possess the authority to enter a shared, second-floor kitchen inside the Church Street home or the concomitant ability to detain him in some manner during the

---

[8] The U.S. Supreme Court has recently determined that this authority is not completely unlimited. See Bailey v. United States, 133 S. Ct. 1031, 1043 (2013) ("A spatial constraint defined by the immediate vicinity of the premises to be searched is therefore required for detentions incident to the execution of a search warrant."). But Jackson readily concedes he was detained while present inside the Church Street home, so the circumstances contemplated by Bailey are not presented here.

- 9 -

execution of the valid search warrant. Indeed, plaintiff eventually concedes as much in his opposition memorandum. See Pl.'s Mem. Opp'n Summ. J. at 6 ("Plaintiff does not disagree that [law enforcement] were conducting a lawful search for narcotics and contraband, authorized by Judge Crandall, at the address in which Plaintiff resides."). Accordingly, any claim that detaining plaintiff for any length of time was somehow unreasonable *per se* must be rejected.

### B. Excessive Force / Failure to Intervene

Given this initial conclusion, Jackson's § 1983 claims still require a determination regarding whether, viewing the record in the light most favorable to plaintiff, a reasonable jury could conclude: (1) Pavlot and / or Monahan carried out their detention and escort of plaintiff in an objectively unreasonable manner; and relatedly, whether (2) one failed to intervene to stop the other from acting unreasonably under the circumstances.

First, "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness standard." Graham v. Connor, 490 U.S. 386, 395 (1989). Under Graham, "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397.

This "reasonableness" test requires a consideration of the totality of the circumstances giving rise to the challenged interaction. Lozada v. Weilminster, 92 F. Supp. 3d 75, 92 (E.D.N.Y. 2015). Simply stated, the "[a]pplication of physical force is 'excessive' when it is more than is necessary in the circumstances." Bancroft, 672 F. Supp. 2d at 405. At the

same time, however, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Id. (quoting Graham, 490 U.S. at 396).

Jackson asserts in his opposition memorandum that "[e]verything from the unnecessary harsh handcuffing, to the pushing of Plaintiff resulting in him striking his head, to escorting him downstairs while handcuffed behind his back, was excessive." Pl.'s Mem. at 6. But this language requires some careful parsing at the outset, since it actually leaves the remaining scope of plaintiff's § 1983 claims a little unclear.

For instance, assuming Jackson erroneously omitted a comma from this statement, intending to complain about the "unnecessary[,] harsh handcuffing," his challenge could be fairly read as including the assertion that *any* use of handcuffs at all was unreasonable under these circumstances. If, on the other hand, plaintiff erroneously omitted a suffix, intending to complain about the "unnecessar[ily] harsh handcuffing," his challenge is better understood as a claim that begins with the manner in which the handcuffs were applied.

### 1. Decision to Use Handcuffs

Assuming Jackson intended to press the more expansive construction of this phrase, his assertion that the officers' mere use of handcuffs during the detention could be found objectively unreasonable must be rejected.

"Inherent in Summers' authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." Mena, 544 U.S. 93. Where, as here, there is a possibility that a search may turn up contraband or even weapons, the U.S. Supreme Court has previously concluded that "the use of handcuffs minimizes the risk of harm to both officers and occupants." Id. at 100. Indeed, the Supreme Court in

- 11 -

Mena specifically noted that "the need to detain multiple occupants during the search ma[kes] the use of handcuffs all the more reasonable." Id.

Considering all the undisputed factors present in this case—law enforcement's ongoing attempt to locate and temporarily detain at least "four to five" occupants found on multiple floors of a home during the execution of a valid no-knock warrant for contraband believed to be connected to an individual who may have been in possession of a firearm—no reasonable jury could conclude that the officers' decision to use handcuffs to temporarily detain Jackson for three to four minutes during the search was anything other than objectively reasonable under the circumstances. See, e.g., Jackson ex rel. Jackson, 87 F. Supp. 3d at 401 (finding it objectively reasonable for officers executing a search warrant to detain and handcuff suspects who were not target of investigation during approximately ten-minute search); McKim v. Cnty. of Rensselaer, 2011 WL 2580327, at *11 (N.D.N.Y. June 28, 2011) (Sharpe, J.) ("[G]iven defendants' belief that narcotic transactions were being conducted in plaintiffs' apartment, the mere facts that plaintiffs were handcuffed and, at times, held at gunpoint, do not alone supply a basis for a claim of excessive force."); Bancroft, 672 F. Supp. 2d at 405 (rejecting claim that officers' decision to use handcuffs on occupants during brief detention could be excessive where use of handcuffs had already been deemed a "privileged action" under the rationale of Mena); Notice v. Koshes, 386 F. Supp. 2d 23, 27 (D. Conn. 2005) ("In this case, where the plaintiffs do not dispute the validity of the warrant and, therefore, the existence of probable cause to search for drugs and weapons at the residence, there is no question that the use of handcuffs does not rise to the level of a constitutional violation.").

**2. Tight Handcuffing**

Second, although Jackson does explicitly attempt to articulate that his excessive force claim is based on any assertion that the handcuffs, once applied, were made excessively tight, it is recognized that many courts in this Circuit have adopted a slightly altered "reasonableness" standard for evaluating such claims. See Smith v. Skardinski, 2013 WL 2427434, at *4 (N.D.N.Y. June 4, 2013) (expressing skepticism regarding this approach in light of Graham's reasonableness standard).

In this inquiry, courts consider evidence that: (1) the handcuffs were made unreasonably tight; (2) the defendants ignored pleas that the handcuffs were too tight; and (3) the degree of injury to the wrists. Usavage v. Port Auth. of N.Y. & N.J., 932 F. Supp. 2d 575, 592 (S.D.N.Y. 2013). In other words, the hallmarks of this kind of claim are allegations that "a police officer tightened handcuffs to an unreasonable degree, that the plaintiff protested to no avail, and that the plaintiff suffered serious injury as a result." Id. at 594 (denying summary judgment on excessive force in handcuffing claim where plaintiff claimed defendant "maliciously compressed" handcuffs in response to his complaints of tightness).

To the extent Jackson's claim may alternatively be construed as one based on such a theory, it must also fail. According to plaintiff, he told the officers they were hurting him while they pulled his left arm back to handcuff him. Plaintiff further claims that the officer wrenched this left arm and were "really clenching up on [his hands] pretty hard" during this handcuffing process.

But Jackson's own narrative fails to include any indication that he ever felt that the handcuffs, once applied, were too tight during the approximately "three to four" minutes he claims they were on his wrists. See Smith v. City of New York, 2010 WL 3397683, at *11

(S.D.N.Y. Aug. 27, 2010) ("A handcuffing cannot be expected to be comfortable, and there is nothing in plaintiff's testimony to suggest that this handcuffing was unreasonably tight.").

Nor is there any indication in the record that Jackson communicated such a feeling to the officers, or that he did and such a plea was ignored, or that he requested any medical attention during or immediately after this encounter. See Ferraresso v. Town of Granby, 646 F. Supp. 2d 296, 307 (D. Conn. 2009) (granting summary judgment on handcuffing claim where plaintiff's testimony established that he did not complain to officers of any injuries, request any medical attention, or even inform defendant officers that the handcuffs had been applied too tightly).

Rather, Jackson's narrative only indicates that his initial request to be handcuffed in front was denied, the officers were rough and forceful with him after helping him to his feet, and that, following the dispute in the stairwell, the officers eventually released him so that he could make his way to the living room on his own. Those claims, and plaintiff's claims of significant injury resulting from his encounter, will be addressed below. But viewing all the facts regarding the handcuffs themselves in the light most favorable to plaintiff, any unarticulated claim based on "tight handcuffing" must be dismissed.

### 3. Officers' Conduct

What remains is an analysis of whether a reasonable jury could find that one or more aspects of either officer's conduct—wrenching Jackson's left arm behind him during the handcuffing, being rough and forceful while helping him stand up, causing him to bump his head while pulling up his pants, or carrying him down to the first landing of the stairs following his verbal refusal to cooperate—considered individually or in the aggregate, was objectively unreasonable under the circumstances.

To review, Jackson's narrative is as follows: several officers entered the second-floor kitchen, told him to get down on the floor, and ran to the third-floor attic area, presumably to check that space for occupants. When the officers returned to the kitchen, defendants forcefully handcuffed him behind his back when he indicated he could not put his hands behind him.[9] The officers wrenched plaintiff's left arm in this process.[10]

Pavlot, along with Monahan, then "helped" Jackson to a standing position. Defendants assert, and plaintiff does not deny, that by this time in the encounter plaintiff's pants had begun falling down. When the officers, who were being rough and forceful, fumbled to pull plaintiff's pants up, plaintiff fell forward and struck his head on the microwave.

The officers then attempted to escort Jackson to the first-floor living room via the stairwell. Plaintiff argued with the officers for a few seconds before they decided to carry him down to the first landing, but then released him to walk the rest of the way down the stairs himself.

Jackson contends that this entire course of conduct was completely unnecessary because defendants were already in "complete command of the situation" by the time the challenged events occurred. But although plaintiff believes defendants should have been more solicitous of his requests to be handcuffed in front or perhaps less forceful in responding to his refusal to walk down the stairs, the appropriate question is whether a reasonable jury could find the officers' challenged conduct to be objectively unreasonable

---

[9] Jackson specifically claims that his disability affects only his *lower* limbs.

[10] Plaintiff alleges injury to his *right* shoulder.

under the circumstances, not whether a plaintiff can identify "some less intrusive alternative [that] would have done the job."  Bancroft, 672 F. Supp. 2d at 406.

Instead, Jackson's own narrative underscores that the entire episode—from the time he was first handcuffed to the moment he was released—occurred while the police were in the process of securing the premises and gathering its occupants, including plaintiff, in the first-floor living room area.  Indeed, crediting plaintiff's version of events, and drawing all reasonable inferences from that narrative in his favor, there is no indication that defendants applied anything approaching an objectively unreasonable, let alone a gratuitous, amount of force either during the initial handcuffing or at any time during the approximately "three to four" minutes plaintiff remained handcuffed.  See Ferraresso, 646 F. Supp. 2d at 308 ("There is no proof here that [the officer], by twisting [plaintiff's] left arm and placing it behind his back, used force that would constitute a constitutional violation."); Bancroft, 672 F. Supp. 2d at 406 (declining to find any constitutional violation from plaintiff's allegations of officers' forceful behavior, including a "single push," during the time he was handcuffed).

To be sure, Jackson was an innocent tenant who claims to have sustained a significant injury during the lawful execution of a search warrant for drugs.[11]  But "reasonable force does not become unconstitutional merely because it caused the plaintiff serious injury." Ferraresso, 646 F. Supp. 2d at 308 (citations omitted).  Viewing all of the facts in the light most favorable to plaintiff, the non-movant here, no reasonable juror could conclude that either officer's conduct violated plaintiff's federal constitutional rights.  Accordingly, plaintiff's § 1983 claim for excessive force and failure to intervene will be dismissed.

---

[11] A careful reading of the submissions raise serious questions about whether or not plaintiff actually sustained any significant or serious injuries.

### C. Municipal Liability

Jackson has also named the Village as a defendant to this action. However, plaintiff's opposition memorandum indicates that "no Monell claim was intended to be filed herein." Pl.'s Mem. at 16. In any event, since there was no violation of plaintiff's federal constitutional rights, the Village has no liability under Monell. See, e.g., Lynch ex rel. Lynch, 567 F. Supp. 2d at 469. Accordingly, plaintiff's § 1983 claims against the Village will be dismissed.

### D. State Law Claims

As just discussed, all of Jackson's federal § 1983 claims will be dismissed. When a plaintiff's federal claims are dismissed before trial, a district court should generally decline to exercise supplemental jurisdiction over any state law claims absent exceptional circumstances. Genovese v. Town of Southampton, 921 F. Supp. 2d 8, 26 (E.D.N.Y. 2013) (collecting cases). There are no exceptional circumstances present in this case that might warrant a different conclusion. Accordingly, supplemental jurisdictional over plaintiff's state law claims will be declined. 28 U.S.C. § 1367(c)(3).

## V. CONCLUSION

Defendants' motion for summary judgment will be granted in part and denied in part. Jackson's § 1983 claims for excessive force against Pavlot and Monahan will be dismissed. Given this conclusion, plaintiff's § 1983 claims asserting a failure to intervene to prevent the use of such force must be dismissed. Since there has been no underlying federal constitutional violation, plaintiff's Monell claim against the Village must also be dismissed. Finally, as the only federal claims have been dismissed, supplemental jurisdiction over plaintiff's state law claims will be declined.

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED in part and DENIED in part;

2. Plaintiff's § 1983 claims for excessive force and failure to intervene are DISMISSED;

3. Plaintiff's § 1983 claim for municipal liability is DISMISSED; and

4. Jurisdiction over plaintiff's state law claims is DECLINED and those claims are DISMISSED without prejudice.

The Clerk of the Court is directed to enter a judgment accordingly and close the file.

IT IS SO ORDERED.

Dated: January 11, 2016
Utica, New York.

United States District Judge